IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ROSELYN KAY MARSHALL,** | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| v. | ]   CV-08-BE-0721-S |
| | ] |
| **HALL HOUSING INVESTMENTS, INC.,** | ] |
| | ] |
| Defendant. | ] |

## MEMORANDUM OPINION

This case comes before the court on "Defendant's Motion for Summary Judgment" (doc. 23). The parties have fully briefed the motion. Plaintiff Marshall asserts that the Defendant terminated her in retaliation for her aiding and encouraging minorities to apply for housing, in violation of 42 U.S.C. § 3617. For the reasons stated below, the Defendant's motion for summary judgment (doc. 23) will be GRANTED as articulated in this opinion. A separate order to that effect will be entered simultaneously.

## FACTS

Hall Housing Investments, Inc. (HHI) owns and operates forty-two residential apartment complex properties located in Alabama, Georgia, and Florida. HHI's apartment complexes range in size from 14 units to 224 units. HHI's Director of Operations, Dale Fowler, interviewed and hired Plaintiff Roselyn Marshall as a Property Manager on May 8, 2006 after she responded to a newspaper advertisement.

Marshall was an experienced certified Property Manager. Prior to working for HHI,

Marshall had approximately 19 years of experience in the real estate industry including working for four different property management companies and two real estate agencies in various positions including stints as Property Manager and Regional Manager.  She had also received training from Spectrum Management for several years and obtained her fair housing certification from that training company.  As an HHI Property Manager, Marshall was responsible for reviewing and assisting with the day-to-day operations of the apartment complexes.

Specifically, Marshall's first assignment was to perform the Resident Manager duties for Hunter Ridge, a Trussville, Alabama HHI property.  HHI had recently fired Hunter Ridge's previous Resident Manager. Betty Byrd, a Senior Property Manager, and Marshall worked together to run Hunter Ridge until HHI could hire a new Resident Manager.  Because Marshall was a new hire, Byrd supervised and trained Marshall. Byrd, in turn, reported directly to Fowler.

HHI has a written policy that prohibits "offensive conduct or harassment" based on race and requires HHI supervisors and mangers to take proper action to end such behaviors or be subject to disciplinary action.  The HHI policy allowed Marshall to take any complaint she had to her supervisor, Betty Byrd.

During Marshall's three month tenure with HHI, she worked at two properties:  Hunter Ridge located in Trussville, Alabama, and Beverlye Crossings located in Dothan, Alabama.  The vast majority of Marshall's work was at Hunter Ridge, which had 200 apartment units; she only spent two to three days working at Beverlye Crossings.  When she worked at Beverlye Crossings, Marshall stayed at her home in Dothan, but when she worked at Hunter Ridge, she stayed at the Hampton Inn on Highway 11 in Trussville close to Hunter Ridge.  When Marshall worked at Hunter Ridge, she typically arrived on Monday and left on Friday for the four hour drive back to

Dothan, but sometimes had to stay seven or eight days before she could return home.

Marshall's regular work hours were the office hours of whatever property she was assigned to at the time beginning when the office opened and ending when the office closed, but she sometimes had to respond to pages or issues that occurred outside of those hours. Hunter Ridge's regular office hours were 9 a.m. to 6 p.m. Monday through Friday, 10 a.m. to 4 or 5 p.m. on Saturday, and 1 p.m. to 4 p.m. on Sunday. If a Property Manager needed to stay at Hunter Ridge over the weekend, Marshall and Byrd would rotate that assignment.

Several weeks after Marshall began working, HHI hired two co-Resident Managers for Hunter Ridge. Marshall continued working at Hunter Ridge with Byrd to help train the new Resident Managers. Shortly thereafter, HHI terminated the employment of one of the new co-Resident Managers and replaced her with Betty Neighbors, an HHI Senior Resident Manager who had been the Resident Manager at another HHI property located in Alexander City.

Neighbors was trained and instructed by HHI that it is against their policy to discriminate against applicants and tenants through 1) an initial new employee training session that lasted one and one-half days, 2) approximately six classroom training sessions held in HHI's corporate office in Dothan each lasting two and one-half days, and 3) 72 monthly telephone conference calls all of which were led by Gary Hall, HHI's owner, Fowler, and other HHI management personnel.

HHI asserts that as a Resident Manager, Neighbors was subordinate to Marshall; however, Marshall contends that while Neighbors technically may have been below Marshall in the hierarchy, as a practical matter, Neighbors was not capable of being supervised by either Marshall or Byrd because Neighbors reported directly to Fowler.

HHI's properties primarily consist of affordable housing complexes participating in the low income housing tax credit program with maximum income limitations that tenants cannot exceed to be qualified to live at the complexes. Hunter Ridge is a participating property.

HHI has a Tenant Selection Criteria for its Managers to use in determining who was eligible for tenancy at an HHI property. After an applicant submits a tenancy application and the $35 application fee, the Resident Manager collects information from the tenant such as a local criminal background check, landlord verifications, and employment verifications. HHI gives a receipt for each application fee paid and management uses the submitted applications in concert with the copies of receipts to create or add to a waiting list.

HHI keeps "waiting lists" at its properties that are chronological lists of submitted applications that track the status of each submitted application for tenancy regardless of whether the application is approved or denied, whether there are vacancies or not, and whether the applicant actually moves in or not.

HHI allows Resident Managers, such as Neighbors, to advise potential applicants that they do not meet income limit qualifications if it is obvious that the applicant's income exceeds the limit authorized by the tax credit program. Marshall asserts that Neighbors and Crystal Cochran (a Resident Manager at HHI's Beverlye Crossing property) also discouraged minority applicants of whom they did not approve.

Property Managers, such as Marshall, could and did discourage potential applicants from submitting applications that included disqualifying criteria (e.g., violent felony crime) listed in the Tenant Selection Criteria.

However, neither Property Managers nor Resident Managers had the authority to approve

or disapprove tenancy applications. HHI authorizes Resident Managers to submit the applicant's information to HHI's corporate office in Dothan. HHI then obtains credit and national criminal background reports. Then, HHI's corporate office makes the ultimate decision to either approve or deny the application. Once a decision is made as to whether the application is approved, within ten days HHI sends a determination letter notifying the applicant of the decision.

**The Bannisters' Application**

During Marshall's employment as a Property Manager, she and Resident Manager Neighbors got into a dispute regarding the application of two black applicants, the Bannisters, at Hunter Ridge. Marshall heard Neighbors refer to the Bannisters' three teenage sons as "them three nigger boys." Neighbors also told Marshall that Marshall was not putting them in an apartment. Marshall's supervisor, Byrd, intervened to make sure that Marshall, rather than Neighbors, handled the Bannisters' application. Marshall submitted the Bannisters' application to the HHI home office for approval. Byrd made sure that HHI approved the Bannisters' application and the Bannisters subsequently received an apartment at Hunter Ridge.

**Misinformation at Beverlye Crossings**

On another occasion while Marshall was working at Beverlye Crossings, Marshall saw through the window in the Manager's office two black women leaving the office building. Marshall recognized one of the women because she had been a tenant at another complex where Marshall had been Resident Manager in Dothan, Alabama.

The woman Marshall recognized told Marshall that her mother had died recently and that she and her friend were looking for apartments but that they had been told nothing was available at Beverlye Crossings. HHI disputes the fact an HHI employee told the women that no housing

was available.

Marshall did not know and did not ask whether the two women were looking for one apartment to share or two one-bedroom units. Beverlye Crossings does not have any one-bedroom units. Marshall contends that she knew Beverlye Crossings had some vacant units that had not been pre-leased at that time. Marshall told the women units were available at Beverlye Crossings and that she would bring them applications after she got off work.

Marshall asked Beverlye Crossings' Resident Manager Crystal Cochran why they were telling people there were no vacancies. According to Marshall, Cochran responded that Dale Fowler had told Cochran that "we're not putting in no more black people in Beverlye Crossings, she [Fowler] did not want applications taken on any black people." Also, Marshall asserts that Cochran told her that some tenancy applications had been thrown away.

Marshall corrected Cochran by telling her that HHI always gives applications to anyone that asks for them and that you never turn down a person if they want an application. Marshall, however, did not discipline Cochran.

After Marshall talked to Cochran, Marshall called Byrd to tell her what Cochran said that day at Beverlye Crossings, including the fact that Cochran had thrown away some applications. Byrd instructed Marshall to do the best she could. Marshall did not inform Fowler about the issues at Beverlye Crossings.

Later that same evening, Marshall dropped off two applications at the apartment of the woman she had recognized. Neither woman ever submitted either of the applications that Marshall dropped off.

Fowler never knew about the improprieties at Beverley Crossings, Betty Neighbors'

behavior, or the Bannisters' application.

**Marshall's Termination**

During the course of Marshall's employment, Byrd sent Fowler three notes regarding Marshall's behavior of either coming to work late or leaving work early. On June 14, 2006, Byrd noted that she had talked to Marshall twice about being up to thirty minutes late to work and partying with a non-management employee named Tina. On July 28, 2006 Byrd noted that Marshall left work before 2 p.m. Finally, on August 11, 2006, Byrd noted that Plaintiff had left at 1:25 p.m.

Although Marshall admits that she was late because of car trouble on one or two occasions, Marshall contends that Byrd never counseled her about being late. Also, Marshall claims that if she ever left work early, she had Byrd's permission. Furthermore, Marshall asserts that Byrd told her that she was doing a good job.

Nevertheless, Fowler made the decision to terminate Marshall's employment because according to Byrd, Marshall had been repeatedly late, left work early on three different occasions, and spent an excessive amount of time on her personal cell phone during the course of the work day. Marshall asserts that Byrd recommended that Marshall be terminated; HHI contends that Byrd merely discussed termination of Marshall's employment with Fowler.

On August 15, 2006, Byrd told Marshall that HHI was terminating her employment because Marshall had been late for work and had left early. At the time of the termination, Marshall was still in her introductory probationary period with HHI. Marshall did not pursue any internal grievance with HHI regarding the termination of her employment.

After the end of her employment with HHI, Marshall fled for unemployment benefits. On

7

August 16, 2006, Fowler filed a response to the unemployment claim stating that HHI terminated Marshall's employment because "she couldn't do the work (files) required - left early at 1:25 even though warned previously not to leave, still in probationary status."

Plaintiff Marshall filed this action asserting claims of racial discrimination and retaliation under The Fair Housing Act, 42 U.S.C. §§ 3604, 3617. The court granted Defendant HHI's motion for judgment on the pleadings as to the racial discrimination claim. Defendant filed a motion for summary judgment. The parties have fully briefed the motion.

### STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving

9

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

## DISCUSSION

Plaintiff Marshall asserts that HHI fired her because she aided and encouraged minorities in the exercise of their rights protected by The Fair Housing Act, in violation of her rights under 42 U.S.C. § 3617, a provision of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, 3631. According to section 3617, it is unlawful to coerce, intimidate, threaten, or interfere with any person on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of the Fair Housing Act. Section 3604 proscribes, *inter alia*, racial discrimination in the rental of housing. *See* 42 U.S.C. § 3604(b).

Specifically, Marshall asserts that HHI did not want anymore black tenants in HHI's

apartment complexes and, therefore, HHI employees did not take applications from black people, and fraudulently told black people that HHI had no vacancies. Plaintiff Marshall also asserts that, because she gave black people HHI housing applications, informed them that in fact HHI had vacant units, and processed the applications, HHI retaliated against her by terminating her employment.

### Retaliation

Plaintiff Marshall asserts that, because she encouraged and aided minorities in their efforts to obtain housing at Defendant's apartment complexes, HHI retaliated against her by terminating her. The court analyzes claims of retaliation for engaging in a protected activity under the *McDonnell Douglas* burden-shifting framework. *Bernard v. SSA Security, Inc.*, 299 F. App'x 927, 929 (11th Cir. 2008). Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### A. Prima Facie Case

To establish a prima facie case of retaliation under § 3617 of the Fair Housing Act, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered adverse action, and (3) the adverse action was causally related to the protected activity. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir. 2003) (citations omitted). HHI does not dispute that Plaintiff Marshall suffered an adverse action when HHI terminated her and that Marshall engaged in statutorily protected activities when she aided and encouraged blacks applying for housing. HHI does dispute that a causal connection exists between Marshall's aid and encouragement of minorities and her termination.

### 1. Causal Link

"The causal link element is construed broadly so that a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks omitted). To meet this requirement, a plaintiff must establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). If a plaintiff cannot show retaliatory animus on the part of the decision maker, she can attempt to establish causation by showing that the decision maker followed a biased recommendation without independent investigation, such that the decision maker was "a mere conduit . . . to give effect to the recommender's [retaliatory] animus." *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

Marshall asserts that a causal connection exists between Fowler's decision to terminate her and her telling two black women about vacancies at Beverlye Crossings and giving them housing applications. But Marshall has not provided any evidence, direct or circumstantial, showing that *anyone* at HHI knew–prior to Marshall's deposition–that she either talked to the women or took applications to them. Therefore, Marshall has failed to show the requisite causal link between her termination and her assisting the women at Beverlye Crossings.

Additionally, Marshall asserts that she processed the Bannisters' housing application despite the protests of Betty Neighbors, a subordinate employee. Although Marshall presented evidence that she told her supervisor, Betty Byrd, about Neighbors' discriminatory objections, Marshall did not tell Byrd that she was going to process the Bannisters' application despite

Neighbors' incendiary comments. In fact, Marshall testified that after she reported Neighbors' behavior to Byrd, *Byrd* intervened to make sure that Marshall, rather than Neighbors, handled and processed the Bannisters' application.

Furthermore, HHI asserts that Dale Fowler, not Betty Byrd, made the decision to terminate Marshall. The parties dispute whether Marshall's supervisor, Betty Byrd recommended that Fowler fire Marshall; however, even viewing the evidence in the light most favorable to Marshall and assuming that Byrd in fact made the recommendation, Marshall has failed to show that Byrd possessed any retaliatory animus or ill feelings towards Marshall. In fact, Marshall's evidence shows that Byrd encouraged Marshall's assistance of minority applicants by instructing Marshall to handle the Bannisters' application and making sure that HHI approved the Bannisters' application.

Because the undisputed facts show that Fowler neither knew of nor accepted a bias recommendation regarding Marshall's protected actions, Plaintiff Marshall has not met her burden. The court concludes that Plaintiff has not shown any genuine issues of material fact as to the issue of a causal link between Plaintiff Marshall's protected actions and her termination. Accordingly, the court determines that summary judgment is proper for HHI on Plaintiff Marshall's remaining retaliation claim.

## CONCLUSION

For the reasons stated above, the court GRANTS the Defendant's motion for summary judgment. A separate order to that effect will be entered simultaneously.

Specifically, the court GRANTS the Defendant's motion for summary judgment because Plaintiff has not carried her burden as to the issue of a causal link between Plaintiff Marshall's

protected actions and her termination.

       DATED this 14th day of September, 2009.

                                        _____
                                        KARON OWEN BOWDRE
                                        UNITED STATES DISTRICT JUDGE